Michael D. Mulvaney (*pro hac vice*)
mmulvaney@maynardnexsen.com
John A. Little, Jr. (*pro hac vice*)
jlittle@maynardnexsen.com
Caleb C. Wolanek (*pro hac vice*)
cwolanek@maynardnexsen.com
MAYNARD NEXSEN PC
1901 Sixth Avenue North, Suite 1700
Birmingham, AL 352103
T: (205) 254-1000
F: (205) 254-1999

Cindy M. Rucker (SBN 272465)
crucker@maynardnexsen.com
MAYNARD NEXSEN LLP
10100 Santa Monica Boulevard, Suite 550
Los Angeles, CA 90067
T: (323) 987-3356
F: (205) 254-1999

*Attorneys for Defendant*
*New York Life Insurance and Annuity Corp.*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
## EASTERN DIVISION—RIVERSIDE

| | |
|---|---|
| BARBARA LINHART,<br>on behalf of herself and all others similarly situated,<br><br>               Plaintiff,<br><br>   v.<br><br>NEW YORK LIFE INSURANCE AND ANNUITY CORPORATION;<br>and DOES 1 TO 50, inclusive,<br><br>               Defendants. | Case No. 5:21-cv-01640-JWH<br><br>**DEFENDANT NEW YORK LIFE INSURANCE AND ANNUITY CORPORATION'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**<br><br>Motion Hearing:  April 5, 2024<br>                 9:00 a.m.<br>                 Courtroom 9D<br>District Judge:  Hon. John W. Holcomb<br>Complaint Filed:  September 28, 2021 |

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................. 2

TABLE OF AUTHORITIES ........................................................................... 4

INTRODUCTION ....................................................................................... 11

BACKGROUND ........................................................................................ 12

   I.  Statement of Facts ..................................................................... 12

      A.  NYLIAC issued the Policy in 2007 ............................. 12

      B.  The Statutes went into effect on January 1, 2013. ..... 13

      C.  Each year from 2013 to 2021, NYLIAC's Annual Policy Summary notified Mr. Linhart that he could designate a secondary recipient for notices ......................................................................... 13

      D.  For years, Mr. Linhart did not make sufficient premium payments. ......... 14

      E.  In April 2021, Mr. Linhart called about changing his insurance coverage. ..................................................... 15

      F.  In June and July 2021, NYLIAC sent more grace notices, but Mr. Linhart told NYLIAC that he wanted to "cancel" the Policy. .................. 16

      G.  The Policy terminated on August 3, 2021—before Mr. Linhart died. ....... 17

   II.  Procedural History .................................................................... 18

LEGAL STANDARDS ................................................................................ 18

   I.  Summary Judgment ................................................................... 18

   II.  Statutory Interpretation ............................................................ 18

ARGUMENT ............................................................................................. 20

   I.  NYLIAC is entitled to summary judgment on Plaintiff's contract claim. ....... 20

      A.  NYLIAC did not breach the Policy or violate the Statutes. ...................... 20

         1.  NYLIAC gave Mr. Linhart a 62-day grace period............................... 20

         2.  NYLIAC gave Mr. Linhart a timely pre-lapse notice. ......................... 21

         3.  NYLIAC gave Mr. Linhart annual notice of his right to designate a third party to receive notices. ........................................................... 22

4.   NYLIAC did not have to send Mr. Linhart a designation "form." ....... 25

B.   A violation of the Statutes would not be a breach of contract here. .......... 28

C.   Plaintiff cannot show that any statutory violation proximately caused harm. ......................................................................................................... 30

D.   Plaintiff cannot establish an excuse for nonperformance........................... 32

II.   NYLIAC is entitled to summary judgment on Plaintiff's bad-faith claim. ....... 33

III. NYLIAC is entitled to summary judgment on punitive damages. ................... 34

CONCLUSION................................................................................................................ 35

NYLIAC's Brief in Support of its Motion for Summary Judgment

**TABLE OF AUTHORITIES**

**CASES**

*Abdelhamid v. Fire Insurance Exchange,*
    182 Cal. App. 4th 990 (2010)..........................................................................33

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ......................................................................................18

*Ball v. California State Automobile Association Inter-Insurance Bureau,*
    201 Cal. App. 2d 85 (1962).......................................................................26–27

*Behnke v. State Farm General Insurance,*
    196 Cal. App. 4th 1443 (2011)......................................................................33

*Bentley v. United of Omaha Life Insurance,*
    2018 WL 3357458 (C.D. Cal. May 1, 2018).................................................31

*Berry v. American Express Publishing, Inc.,*
    147 Cal. App. 4th 224 (2007)........................................................................19

*Bosetti v. United States Life Insurance Co. in the City of New York,*
    175 Cal. App. 4th 1208 (2009)......................................................................33

*Brosnan v. Castellanos,*
    2009 WL 2246210 (N.D. Cal. July 27, 2009) ..............................................29

*Butte Fire Cases,*
    24 Cal. App. 5th 1150 (2018)........................................................................35

*California State University, Fresno Association v. County of Fresno,*
    9 Cal. App. 5th 250 (2017)............................................................................28

*California v. Altus Finance S.A.,*
    540 F.3d 992 (9th Cir. 2008).........................................................................34

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ......................................................................................18

*Chateau Chamberay Homeowners Association v. Associated International Insurance,*
    90 Cal. App. 4th 335 (2001)..........................................................................33

*Crossroads Invstors v. Federal National Mortgage Association,*
    13 Cal. App. 5th 757 (2017)..........................................................................30

*Cummins, Inc. v. Superior Court,*
    36 Cal. 4th 478 (2005)............................................................................28

*Doe v. Lee,*
    79 Cal. App. 5th 612 (2022)..................................................................35

*Durell v. Sharp Healthcare,*
    183 Cal. App. 4th 1350 (2010)..............................................................33

*Elhouty v. Lincoln Benefit Life,*
    121 F. Supp. 3d 989 (E.D. Cal. 2015),
    *aff'd*, 886 F.3d 752 (9th Cir. 2018) ......................................................21

*Ennabe v. Manosa,*
    58 Cal. 4th 697 (2014)............................................................................19

*Even Zohar Construction & Remodeling, Inc. v. Bellaire Townhouses, LLC,*
    61 Cal. 4th 830 (2015)............................................................................19

*Food Pro International, Inc. v. Farmers Insurance Exchange,*
    169 Cal. App. 4th 976 (2008)................................................................35

*Galanty v. Paul Revere Life Insurance,*
    23 Cal. 4th 368 (2000)............................................................................25

*Guebara v. Allstate Insurance,*
    237 F.3d 987 (9th Cir. 2001). ................................................................33

*In re D.B.,*
    58 Cal. 4th 941 (2014)............................................................................19

*In re First Alliance Mortgage Co.,*
    471 F.3d 977 (9th Cir. 2006)..................................................................35

*Interinsurance Exchange of the Automobile Club of Southern California v. Ohio Casualty Insurance,*
    58 Cal. 2d 142 (1962)............................................................................29

*Lara v. First National Insurance Co. of America,*
    25 F.4th 1134 (9th Cir. 2022)................................................................31

*Larkin v. Workers' Compensation Appeals Board,*
    62 Cal. 4th 152 (2015)............................................................................18

*Los Angeles County Metropolitan Transportation Authority v. Alameda Produce Market,*
    52 Cal. 4th 1100 (2011)..................................................................19, 23

NYLIAC's Brief in Support of its Motion for Summary Judgment

*Martin ex rel. Heckman v. Midwest Express Holdings, Inc.*,
    555 F.3d 806 (9th Cir. 2009) .................................................................24

*McGreehan v. Cal. State Automobile Association*,
    235 Cal. App. 3d 997 (1991) .................................................................25

*McHugh v. Protective Life Insurance*,
    2022 WL 6299640 (Cal. Ct. App. Oct. 10, 2022) ................................31

*McHugh v. Protective Life Insurance*,
    12 Cal. 5th 213 (2021) .................................11, 13, 22, 27–29, 31, 34

*Moradi-Shalal v. Fireman's Fund Insurance*,
    46 Cal. 3d 287 (1988) ...........................................................................29

*Nelson v. Pima Community College*,
    83 F.3d 1075 (9th Cir. 1996) ................................................................18

*Nieto v. Blue Shield of California Life & Health Insurance*,
    181 Cal. App. 4th 60 (2010) .................................................................34

*Nieves v. United of Omaha Life Insurance*,
    2023 WL 2705836 (S.D. Cal. Mar. 28, 2023) ................................31–32

*Oasis West Realty, LLC v. Goldman*,
    51 Cal. 4th 811 (2011) .............................................................20, 30, 32

*Opsal v. USAA*,
    2 Cal. App. 4th 1197 (1991) .................................................................34

*Park v. AXA Equitable Life Insurance*,
    2023 WL 1931373 (C.D. Cal. Jan. 11, 2023),
    *appeal docketed*, No. 23-55130 (9th Cir.). ........................................29

*People v. Gonzalez*,
    2 Cal. 5th 1138 (2017) ..........................................................................18

*People v. Gray*,
    58 Cal. 4th 901 (2014) ..........................................................................26

*People v. Johnson*,
    28 Cal. 4th 240 (2002) ..........................................................................19

*People v. Lewis*,
    86 Cal. App. 5th 34 (2022) ...................................................................19

*People v. Vaca*,
    89 Cal. App. 5th 1113 (2023) ...............................................................19

NYLIAC's Brief in Support of its Motion for Summary Judgment

*Pitt v. Metropolitan Tower Life Insurance*,
2022 WL 17972167 (S.D. Cal. Dec. 1, 2022) ......................................31

*Pitt v. Metropolitan Tower Life Insurance*,
2023 WL 3879587 (S.D. Cal. June 5, 2023),
*appeal docketed*, No. 23-55566 (9th Cir.) .......................................26

*Pitts v. Perluss*,
58 Cal. 2d 824 (1962). ........................................................................27

*Postal Instant Press, Inc. v. Sealy*,
43 Cal. App. 4th 1704 (1996). ...........................................................30

*Rattan v. USAA*,
84 Cal. App. 4th 715 (2000) .......................................................20, 28

*Rosen v. Pacific Life Insurance*,
2017 WL 4296655 (Cal. Ct. App. Sept. 28, 2017) .............................22

*Safeco Insurance Co. of America v. Parks*,
170 Cal. App. 4th 992 (2009) ............................................................28

*Satele v. Superior Court*,
7 Cal. 5th 852 (2019) .........................................................................26

*Savetsky v. Pre-Paid Legal Services, Inc.*,
2015 WL 4593744 (N.D. Cal. July 30, 2015) ....................................24

*Scherman v. Farmers New World Life Insurance*,
2017 WL 6947721 (N.D. Cal. Feb. 21, 2017) ....................................22

*Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.*,
78 Cal. App. 4th 847 (2000) ..............................................................35

*St. Paul Fire & Marine Insurance v. American Dynasty Surplus Lines Insurance*,
101 Cal. App. 4th 1038 (2002) ..........................................................30

*Steen v. American National Insurance*,
2023 WL 4004192 (C.D. Cal. June 14, 2023) ......................30–32, 34

*Stephan v. Unum Life Insurance Co. of America*,
697 F.3d 917 (9th Cir. 2012) .............................................................29

*Stonefire Grill, Inc. v. FGF Brands, Inc.*,
987 F. Supp. 2d 1023 (C.D. Cal. 2013) ..............................................18

*Thomas v. State Farm Insurance*,
424 F. Supp. 3d 1018 (S.D. Cal. 2019) ..............................................31

*Thomas v. State Farm Life Insurance,*
　　2021 WL 4596286 (9th Cir. Oct. 6, 2021) ........................................................31

*Tomaselli v. Transamerica Insurance,*
　　25 Cal. App. 4th 1269 (1994) ...............................................................................35

*Troyk v. Farmers Group,*
　　171 Cal. App. 4th 1305 (2009) .............................................................................30

*Vikco Insurance Services v. Ohio Indemnity,*
　　70 Cal. App. 4th 55 (1999) ............................................................................29–30

*Waller v. Truck Insurance Exchange,*
　　11 Cal. 4th 1 (1995) ..............................................................................................25

*Walt Disney Parks & Resorts U.S., Inc. v. Superior Court,*
　　21 Cal. App. 5th 872 (2018). ..........................................................................19, 23

*Wells v. One2One Learning Foundation,*
　　39 Cal. 4th 1164 (2006). ......................................................................................26

*Yeager v. Blue Cross of California,*
　　175 Cal. App. 4th 1098 (2009) ............................................................................19

**STATUTES**

CALIFORNIA CIVIL CODE

　　§ 1102.6g(a) ..........................................................................................................24

　　§ 1630(b) ...............................................................................................................24

　　§ 1803.1(b) .............................................................................................................24

　　§ 2079.10a(a) ..........................................................................................................24

　　§ 2982.5(b) .............................................................................................................24

　　§ 3294(a) .................................................................................................................35

　　§ 3294(c) .................................................................................................................35

CALIFORNIA GOVERNMENT CODE § 84504.3(c) .........................................................24

CALIFORNIA INSURANCE CODE

　　§ 132(g) ..................................................................................................................23

NYLIAC's Brief in Support of its Motion for Summary Judgment

§ 396(b)(1) .................................................................................................. 26

§ 791.02(d) ................................................................................................... 26

§ 790.034(b)(1) ............................................................................................ 23

§ 791.13 ........................................................................................................ 22

§ 1764.1(a)(1) .............................................................................................. 23

§ 1764.1(b) ................................................................................................... 23

§ 10083(a)(1) ............................................................................................... 23

§ 10102(a) .................................................................................................... 23

§ 10110.3(a) ................................................................................................. 26

§ 10113.2(d) ................................................................................................. 23

§ 10113.2(d)(10) .......................................................................................... 23

§ 10113.70(b) ............................................................................................... 23

§ 10113.70(c) ............................................................................................... 23

§ 10113.71 .................................................................................................... 11

§ 10113.71(a) ............................................................................. 13, 20, 30, 32

§ 10113.71(b)(1) ................................................................................ 13, 21, 32

§ 10113.71(b)(3) ...................................................................................... 13, 21

§ 10113.72 .................................................................................................... 11

§ 10113.72(a) ............................................................................. 13, 25–30, 32, 34

§ 10113.72(b) ............................................................. 13, 22–23, 25, 27– 30, 32

§ 10113.72(c) ............................................................................... 13, 21, 32

§ 10113.9(b)(2) ............................................................................................ 23

§ 10115 .......................................................................................................... 26

§ 10120.4(c)(2) ............................................................................................ 23

NYLIAC's Brief in Support of its Motion for Summary Judgment

§ 10140(a)............................................................................................26

§ 10170(f)............................................................................................23

§ 10192.4(a).........................................................................................26

§ 10192.17(a).......................................................................................23

§ 10192.20(a)(3)...................................................................................23

§ 10232.7(c).........................................................................................23

§ 10295.15(a).......................................................................................23

§ 10295(b)(3).......................................................................................26

§ 10507.3(a).........................................................................................23

## RULES

FEDERAL RULES OF CIVIL PROCEDURE

Rule 56(a) ...........................................................................................18

Rule 56(c)(1)(B) ..................................................................................18

## OTHER AUTHORITIES

Appellee's Answer Brief,
    *Thomas v. State Farm Life Insurance*
    (9th Cir. Aug. 27, 2020) (No. 20-55231),
    2020 WL 5351406 .............................................................................31

BLACK'S LAW DICTIONARY (9th ed. 2009) ...........................................26

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002) ...............26

WILLISTON ON CONTRACTS (4th ed. 2023)..............................................25

NYLIAC's Brief in Support of its Motion for Summary Judgment

1    Defendant New York Life Insurance and Annuity Corp. submits this brief to sup-

2   port its Motion for Summary Judgment on Plaintiff Barbara Linhart's individual claims.

3                                    **INTRODUCTION**

4    In 2007, NYLIAC issued a $350,000 life-insurance policy ("the Policy") to James

5   Linhart. Years later, in 2013, California Insurance Code §§ 10113.71–10113.72 ("the

6   Statutes") went into effect. Years after that, in 2021, Mr. Linhart told NYLIAC that he

7   wanted to "cancel" the Policy, and he stopped paying premiums. He then passed away

8   after the Policy lapsed. Plaintiff contends that NYLIAC still owes benefits because, in

9   her view, NYLIAC did not follow the Statutes before the Policy lapsed in August 2021.

10    But NYLIAC fully complied with—and exceeded—the Statutes' protections. The

11   Statutes required a 60-day grace period before a life-insurance policy lapses; NYLIAC

12   gave a *62-day* grace period. The Statutes required one notice of pending lapse; NYLIAC

13   *repeatedly* told Mr. Linhart that his Policy was in danger of lapsing. And the Statutes

14   required giving Mr. Linhart annual notice that he could designate someone else to receive

15   pre-lapse warnings. Every year from 2013 to 2021, NYLIAC did just that.

16    So how does Plaintiff intend to prove her case? By rewriting the Statutes. Plaintiff

17   contends that NYLIAC's annual notice about the right to designate a secondary recipient

18   should have been in a different font size and on a different page, even though the Statutes

19   say nothing about font size or placement, and even though NYLIAC's notice was both

20   prominent and convenient. Plaintiff also says NYLIAC should have sent Mr. Linhart a

21   "form" to use for designating a secondary recipient, even though the California Supreme

22   Court already held in *McHugh v. Protective Life Insurance* that any requirement to give

23   a "form" does *not* apply to policies—like this one—issued before 2013. 12 Cal. 5th 213,

24   236 (2021). For these reasons alone, Plaintiff's claims fail.

25    The problems with Plaintiff's case do not stop there, however. Even if NYLIAC

26   did violate the Statutes, the alleged violation was not itself a breach of contract. Plaintiff

27   also cannot show that any statutory violation was the proximate cause of the Policy's

28   lapse or that Mr. Linhart had an excuse for failing to pay premiums. Again, Mr. Linhart

1 wanted to "cancel" the Policy. His failure to pay was intentional, not inadvertent. The
2 Statutes do not require paying benefits under these circumstances.

3 Finally, Plaintiff seeks damages, including punitive damages, for supposed "bad
4 faith." But Plaintiff cannot show that NYLIAC was unreasonable in any way. Nor can
5 she offer "clear and convincing evidence" of "oppression, fraud, or malice." For these
6 and other reasons, NYLIAC is entitled to summary judgment.

**BACKGROUND**

## I. Statement of Facts

### A. NYLIAC issued the Policy in 2007.

10 In 2007, Mr. Linhart applied for life insurance. JS-1. Based on that application,
11 NYLIAC issued policy number 62 970 515 ("the Policy") in August 2007. JS-2. Mr.
12 Linhart was both the Policy's "owner" and its named insured. JS-3. The Policy was a
13 Universal Life policy and had an initial face amount of $350,000. JS-4–5.

14 Because the Policy was a Universal Life policy, Mr. Linhart did not always have
15 to make a particular premium payment on a particular schedule. JS-6. Instead, he nor-
16 mally could pay premiums at any interval and in almost any amount. JS-7. Premiums
17 added to the Policy "Account Value," and the Account Value earned interest. JS-9–10.
18 Each month, NYLIAC deducted the "Cost of Insurance" and other agreed-on fees ("the
19 Monthly Deduction Charge") from the Account Value. JS-9, JS-11. Mr. Linhart could
20 surrender the Policy for a "Cash Surrender Value," which was the Account Value minus
21 certain "Surrender Charges." JS-13–15. For coverage to stay in force, the Cash Surrender
22 Value needed to be enough to satisfy the next Monthly Deduction Charge. *See* JS-16.

23 The Policy included a 62-day grace period: If the Cash Surrender Value was less
24 than the next Monthly Deduction Charge, then the Policy would "continue for a Late
25 Period of 62 days" after the Cash Surrender Value was insufficient. *Id.* If Mr. Linhart
26 died during that 62-day period, then NYLIAC would pay benefits. *Id.* But if NYLIAC
27 did not receive premiums within the grace period, then, under the contract, "the policy
28 will end and there will be no more benefits under the policy." *Id.*

- 12 -

To ensure Mr. Linhart had notice of a potential lapse, NYLIAC agreed to mail a pre-lapse notice to Mr. Linhart "at least 31 days before the end of the Late Period." *Id.* NYLIAC also agreed to send an annual "written report" summarizing the Account Value and Cash Surrender Value, as well as listing "any other facts required by state law or regulation." JS-17.

**B. The Statutes went into effect on January 1, 2013.**

On January 1, 2013—over five years *after* NYLIAC issued the Policy—the Statutes went into effect. *McHugh*, 12 Cal. 5th at 220. They have three main components.

*First*, a life-insurance policy "issued or delivered" in California "shall contain a provision" allowing a 60-day grace period after a missed premium. Cal. Ins. Code § 10113.71(a). A policy "shall remain in force during the grace period." *Id.*

*Second*, an insurer must send a policyowner a notice of pending lapse and termination within 30 days after a premium is due and unpaid and at least 30 days before the effective date of the termination. *Id.* §§ 10113.71(b)(1), (b)(3), 10113.72(c).

*Third*, an insurer must provide an opportunity to designate a secondary recipient for pre-lapse notices. This general requirement takes different forms at different times. Before a policy is "issued," the insurer must give the "applicant" a form that lets "the applicant" submit the name, address, and phone number of a designee. *Id.* § 10113.72(a). Once a policy is issued, the insurer must "notify the policy owner annually" of the right to add or change a designation. *Id.* § 10113.72(b). If a person is designated as a secondary recipient, then the insurer must send any pre-lapse notice to the designee, along with the policyowner. *Id.* §§ 10113.71(b)(1), (b)(3), 10113.72(c).

**C. Each year from 2013 to 2021, NYLIAC's Annual Policy Summary notified Mr. Linhart that he could designate a secondary recipient for notices.**

Because the Policy took effect as of August 1, 2007, the "Policy Year" ran from August 1 to July 31. JS-18. Every year from 2013 to 2021, NYLIAC sent Mr. Linhart a five- or six-page "Annual Policy Summary" at the end of the Policy Year. JS-20–28. This was the annual "written report" contemplated by the Policy. JS-19. NYLIAC mailed

these Annual Policy Summaries to Mr. Linhart's address of record each year, JS-20–28, JS-38–42, and they were never returned as "undeliverable," JS-29–37.[1]

The Annual Policy Summary reported about the Policy's Account Value and Cash Surrender Value; recounted the prior year's premiums, interest, Cost of Insurance, and fees and other charges; and detailed when the Policy would lapse under certain assumptions. JS-44. Page two of the Annual Policy Summary notified Mr. Linhart that he had a right to "designate a third party to whom we will mail copies of premium, cancellation and lapse notices." JS-45. That notice appeared under a boldface heading that referred to "**California Residents**" and was set apart from the rest of the page by bold lines:

**New Jersey, Vermont, Florida, Maine & California Residents** - If the insured covered by this policy and/or policyowner is age 62 or older (NJ), age 64 or older (VT) or any age (FL, ME and CA), you can designate a third party to whom we will mail copies of premium, cancellation and lapse notices. Please call a Customer Service Representative at the toll-free number on page one for more information regarding this procedure.

*Id.* If Mr. Linhart had contacted NYLIAC and asked to designate a secondary recipient, then NYLIAC would have given him a "form" he could use. JS-47. NYLIAC had such forms at all relevant times. JS-48. But Mr. Linhart never designated a secondary recipient, JS-49, and there is no record he asked about doing so, JS-50.

### D.  For years, Mr. Linhart did not make sufficient premium payments.

For a time, Mr. Linhart's premiums built up the Account Value. But Mr. Linhart began paying less and less, while the Cost of Insurance naturally increased as he aged. JS-12. For five years before the Policy lapsed, Mr. Linhart's annual premiums and interest were never enough to pay for the annual Cost of Insurance and fees. JS-51. In fact,

---

[1]     At first, NYLIAC mailed documents to Mr. Linhart's address in Mission Viejo, CA. *See, e.g.*, JS-20–27. After receiving notice of an address change in 2020, JS-40, NYLIAC began mailing documents to Mr. Linhart's address in Palm Desert, CA, *see, e.g.*, JS-28. In 2021, that Palm Desert address was the address on file for Mr. Linhart, JS-41, and in June 2021, Mr. Linhart confirmed that it was his correct address, JS-43.

between December 20, 2016, and April 7, 2020—a nearly 40-month period—NYLIAC received *zero* premiums for the Policy. JS-52. As a result, the Account Value had to be used to pay for coverage, and the Cash Surrender Value decreased as a result. JS-53–54. As early as 2017, Mr. Linhart's failure to pay premiums meant there could no longer be a guarantee that the Policy would not lapse. JS-55–56.

By March 2020, the Cash Surrender Value was perilously low. In March 2020, June 2020, and July 2020, NYLIAC warned Mr. Linhart that the Policy was "**in danger of lapsing**" and that coverage would end if he did not pay premiums. JS-57–62. In response, Mr. Linhart paid just enough premiums to get by for a month or so at a time. JS-63. But in the August 2020 Annual Policy Summary, NYLIAC explained that even if Mr. Linhart paid his regularly scheduled premium, coverage would not last past May 2021. JS-64. NYLIAC warned: "**IMPORTANT: PLEASE NOTE THAT UNDER THESE ASSUMPTIONS YOUR POLICY WILL LAPSE BEFORE THE NEXT ANNIVERSARY**." *Id.*

But in 2021, Mr. Linhart's failure to pay sufficient premiums continued. In March 2021, April 2021, and May 2021, NYLIAC continued to caution Mr. Linhart that the Policy was "**in danger of lapsing**." JS-65–70. NYLIAC's March 2021 and April 2021 letters warned that the Policy was "in the grace period," JS-66, JS-68, and its May 2021 letter cautioned that "all coverage" would "end" if premiums were not paid, JS-70.

### E.  In April 2021, Mr. Linhart called about changing his insurance coverage.

Around the same time, Mr. Linhart made phone calls about changing his insurance portfolio. One call was to John Hancock Life Insurance Company (U.S.A.). JS-72. John Hancock had issued a $750,000 policy to Mr. Linhart in 2007. JS-71. On April 22, 2021, Mr. Linhart called John Hancock to ask about cancelling or reducing the face value of that policy. JS-72–73. But when John Hancock told him that premiums were set to jump by over 1,600% in December 2022, Mr. Linhart was clear that he did not want his policy anymore. JS-74–75. For example, he stated: "I want to cancel my policy," "We're just going to stop paying," and "let's just … cancel this." JS-75. Mr. Linhart then consented

to remove his John Hancock policy from automatic billing. JS-76. John Hancock terminated that policy for nonpayment of premiums in July 2021. JS-77.

On April 27—five days after calling John Hancock—Mr. Linhart called NYLIAC. JS-78. He told NYLIAC that he would "send a check in today." JS-79. Mr. Linhart also said he wanted "a smaller amount" of coverage and asked how reducing the amount of coverage might lower his premiums. JS-80–81. NYLIAC suggested that he speak with his insurance agent. JS-82. NYLIAC then received Mr. Linhart's last premium payment (a check dated April 26, 2021) on May 3, 2021. JS-83–85. That payment satisfied the Monthly Deduction Charges for April and May 2021, but nothing more. JS-86.

**F.  In June and July 2021, NYLIAC sent more grace notices, but Mr. Linhart told NYLIAC that he wanted to "cancel" the Policy.**

On June 1, 2021, the Policy once again entered a grace period, because the Cash Surrender Value was not enough to pay the Monthly Deduction Charge for June 2021. JS-87. So on June 1, NYLIAC sent Mr. Linhart yet another pre-lapse notice. JS-88. That letter declared that it was "**IMPORTANT INSURANCE POLICY INFORMATION**" that Mr. Linhart should "**OPEN IMMEDIATELY**." JS-89. Inside the letter, NYLIAC warned that the Policy was "**in danger of lapsing**," "does not have sufficient cash surrender value," and was "in the grace period." *Id.* NYLIAC encouraged Mr. Linhart to "act now!" *Id.* "**To keep your coverage in force**," NYLIAC explained, Mr. Linhart needed to pay $1,300.56 by August 3, 2021. *Id.* As a courtesy, NYLIAC included a payment stub and envelope. JS-90. It also directed Mr. Linhart to a website where he could pay online. JS-91. This letter was not returned "undeliverable." JS-92.

Three weeks later, on June 21, NYLIAC sent Mr. Linhart a regularly scheduled reminder for his July 2021 premium. JS-93–94. The minimum monthly premium needed to keep the Policy in force until August 1 was $1,261.44. JS-95–96. To be clear, that amount had "no effect on any previous lapse warnings," but was instead the minimum amount for coverage in July 2021 only. JS-97–98. Still, NYLIAC reminded Mr. Linhart that failure to pay premiums eventually means "coverage … will be terminated." JS-98.

1    Then, on June 28, Mr. Linhart (and a representative of his insurance agent) called
2    NYLIAC. JS-99. Mr. Linhart said he wanted to "cancel" the Policy and receive the Cash
3    Surrender Value. JS-100. At the time, however, the Cash Surrender Value was less than
4    $55, JS-104, and a bank needed to release a "collateral assignment" before Mr. Linhart
5    could surrender the Policy, JS-105. Mr. Linhart was disappointed, and he said he ex-
6    pected his premiums to increase "to some unbelievable number here pretty soon." JS-
7    101. At Mr. Linhart's request, after the call, NYLIAC sent him forms to use for surren-
8    dering the Policy. JS-106.

9    A few days later, on July 1, NYLIAC again sent Mr. Linhart a pre-lapse warning.
10   JS-107. This July 1 letter declared that it was "**IMPORTANT INSURANCE POLICY**
11   **INFORMATION**" and asked Mr. Linhart to "**OPEN IMMEDIATELY**." JS-108. In-
12   side, NYLIAC referenced its June 1 pre-lapse notice, repeated its warning that the Policy
13   was "**in danger of lapsing**," and reminded Mr. Linhart that he needed to pay $1,300.56
14   by August 3, 2021, to keep the Policy "in force." *Id.* Once again, NYLIAC also included
15   a payment stub and envelope and gave information about paying online. JS-110–111.
16   This letter was not returned "undeliverable." JS-112.

17   A few weeks later, on July 23, NYLIAC also sent Mr. Linhart a regularly sched-
18   uled reminder for his August 2021 premium. JS-113–114. It explained that Mr. Linhart
19   needed to pay $711.06 per month, each month, to keep the Policy in force until August
20   2022. JS-115–117. As before, NYLIAC explained that paying $711.06 would have "no
21   effect on any previous lapse warnings," but was instead the minimum amount necessary
22   for coverage in August 2021. JS-118. And as before, NYLIAC warned about the conse-
23   quences of nonpayment. *Id.*

24   **G.  The Policy terminated on August 3, 2021—before Mr. Linhart died.**

25   In August 2021, NYLIAC sent Mr. Linhart another Annual Policy Summary. JS-
26   28. After May 3, 2021, however, NYLIAC received no premiums for the Policy. JS-84.
27   Thus, coverage expired as of August 3, 2021—a full 62 days after the grace period began
28   on June 1. JS-120. Mr. Linhart did not pass away until August 7, 2021. JS-121. He was

- 17 -

therefore alive when the Policy terminated, and the Policy was not in force when he died.

## II. Procedural History

Plaintiff was Mr. Linhart's wife. In September 2021, she sued NYLIAC for breach of contract and bad faith, contending that NYLIAC owes her the Policy's death benefit. ECF No. 1 at 18:25–23:2; *see* ECF No. 38 at 20:24–25:2. NYLIAC is the only named defendant remaining in this putative class action. *See* ECF Nos. 38, 60, 65.

LEGAL STANDARDS

## I. Summary Judgment

Summary judgment is required if "there is no genuine dispute as to any material fact and [NYLIAC] is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). If Plaintiff would have to prove a fact at trial, then NYLIAC may carry its initial burden by simply pointing out a lack of admissible evidence to support Plaintiff's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); FED. R. CIV. P. 56(c)(1)(B). NYLIAC "is not required to produce evidence showing the absence of a genuine issue of material fact, nor is it required to offer evidence negating [Plaintiff's] claim." *Stonefire Grill, Inc. v. FGF Brands, Inc.*, 987 F. Supp. 2d 1023, 1032 (C.D. Cal. 2013).

Once NYLIAC makes its initial showing, it is Plaintiff's burden to show a genuine dispute about a material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Plaintiff cannot rely on "allegation and speculation." *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081 (9th Cir. 1996). Instead, she must show that there is sufficient evidence that a reasonable jury could return a verdict in her favor. *Anderson*, 477 U.S. at 248.

## II. Statutory Interpretation

Three well-settled principles of statutory interpretation help resolve this case.

*First*, courts begin any statutory-interpretation question "'by examining the statute's words, giving them a plain and commonsense meaning.'" *People v. Gonzalez*, 2 Cal. 5th 1138, 1141 (2017) (citation omitted). In doing so, courts "consider the ordinary meaning of the language in question as well as the text of related provisions, terms used in other parts of the statute, and the structure of the statutory scheme." *Larkin v. Workers'*

- 18 -

*Comp. Appeals Bd.*, 62 Cal. 4th 152, 157 (2015). "If the statutory language contains no ambiguity, the Legislature is presumed to have meant what it said, and the plain meaning of the statute governs." *People v. Johnson*, 28 Cal. 4th 240, 244 (2002).

*Second*, courts "'must be careful not to add requirements to those already supplied by the Legislature.'" *Ennabe v. Manosa*, 58 Cal. 4th 697, 719 (2014) (citation omitted). Silence is different from ambiguity, and courts "may not make a silent statute speak by inserting language the Legislature did not put in the legislation." *Yeager v. Blue Cross of Cal.*, 175 Cal. App. 4th 1098, 1103 (2009). The Legislature knows how to create requirements, so the lack of a certain provision "'implies no such … requirement was intended.'" *People v. Vaca*, 89 Cal. App. 5th 1113, 1118 (2023) (citation omitted). This principle "takes on added significance" when the Legislature includes a provision in one part of a statutory system but not in another. *L.A. Cnty. Metro. Transp. Auth. v. Alameda Produce Mkt.*, 52 Cal. 4th 1100, 1108 (2011). In that scenario, courts "presume that the Legislature did not intend the language included in the first to be read into the second." *Walt Disney Parks & Resorts U.S., Inc. v. Superior Ct.*, 21 Cal. App. 5th 872, 879 (2018).

*Third*, "'no legislation pursues its objectives at all costs.'" *People v. Lewis*, 86 Cal. App. 5th 34, 40 (2022) (citation omitted). "'Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice—and it frustrates rather than effectuates legislative intent simplistically to assume that whatever furthers the statute's primary objective must be the law.'" *Id.* (citation omitted). Courts must follow the plain meaning of a statute "'even if it appears probable that a different object was in the mind of the legislature.'" *In re D.B.*, 58 Cal. 4th 941, 948 (2014) (citation omitted).[2]

---

[2] *See also, e.g.*, *Even Zohar Constr. & Remodeling, Inc. v. Bellaire Townhouses, LLC*, 61 Cal. 4th 830, 842 (2015) ("The rule that a remedial statute is construed broadly does not permit a court to ignore the statute's plain language …."); *Berry v. Am. Express Publ'g, Inc.*, 147 Cal. App. 4th 224, 232 (2007) ("We cannot … rewrite a statute under the guise of a liberal interpretation.").

1

**ARGUMENT**

2    **I.  NYLIAC is entitled to summary judgment on Plaintiff's contract claim.**

3         Plaintiff seeks $350,000 in policy benefits from NYLIAC, but she has no private

4    right of action under the Statutes. *See Rattan v. USAA*, 84 Cal. App. 4th 715, 724 (2000).

5    Instead, Plaintiff sued for common-law breach of contract. ECF No. 38 at 20:24–22:15.

6    That means Plaintiff must prove four elements: (1) a contract; (2) Mr. Linhart's "perfor-

7    mance or excuse for nonperformance"; (3) NYLIAC's "breach"; and (4) "resulting dam-

8    age." *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011).

9         Plaintiff tries to prove her claim showing that NYLIAC violated the Statutes. But

10   that attempted bank-shot misses for at least four reasons. *First*, NYLIAC did not breach

11   either the Statutes or the Policy itself. *Second*, even if NYLIAC had violated the Statutes

12   like Plaintiff says, that still would not establish a breach of the contract. *Third*, Plaintiff

13   cannot establish that any violation of the Statutes is the proximate cause of harm. *Fourth*,

14   Plaintiff cannot show that Mr. Linhart had a valid excuse for failing to pay premiums.

15   **A.  NYLIAC did not breach the Policy or violate the Statutes.**

16        Plaintiff's breach-of-contract claim fails from the start because she cannot show

17   that NYLIAC did or failed to do anything in violation of the Policy or the Statutes.

18        ***1.  NYLIAC gave Mr. Linhart a 62-day grace period.***

19        The Statutes' first requirement is that a life-insurance policy "shall contain a pro-

20   vision for a grace period of not less than 60 days from the premium due date." CAL. INS.

21   CODE § 10113.71(a). The Policy complies with—and, in fact, *exceeds*—that requirement

22   because it includes a 62-day grace period. JS-16. NYLIAC then honored the grace period

23   here. As of June 1, 2021, the Cash Surrender Value was less than the next Monthly De-

24   duction Charge, so the Policy entered a 62-day grace period. JS-87. If Mr. Linhart had

25   died during that grace period, then NYLIAC would have paid death benefits. JS-16. But

26   Mr. Linhart did not pay premiums during the grace period, so coverage terminated on

27   August 3. JS-84–85, JS-120. Mr. Linhart was alive at that time. JS-121. NYLIAC thus

28   complied with both the Policy and with § 10113.71(a).

### 2.   *NYLIAC gave Mr. Linhart a timely pre-lapse notice.*

The Statutes also require a pre-lapse notice. More specifically, before a policy terminates "for nonpayment of premium," the insurer must mail the policyowner a notice "at least 30 days prior to the effective date of termination" and "within 30 days after a premium is due and unpaid." CAL. INS. CODE §§ 10113.71(b)(1), (b)(3), 10113.72(c). NYLIAC did just that.

In 2021, NYLIAC repeatedly warned Mr. Linhart that the Policy would lapse if he did not pay premiums. On both June 1 and July 1, NYLIAC mailed notices, by first-class U.S. mail, to Mr. Linhart's address of record. JS-41, JS-88, JS-107. Each notice prominently warned that the Policy was "**in danger of lapsing**." JS-89, JS-108. The first letter—from June 1—cautioned that the Policy was "in the grace period" and urged Mr. Linhart to "act now!" JS-89. To keep coverage in force, Mr. Linhart needed to make a payment by August 3. *Id.* The July 1 letter likewise said that "your policy may lapse" and told Mr. Linhart that he needed to make a payment by August 3 to keep coverage "in force." JS-108. NYLIAC made clear that if the Policy lapsed, then "all coverage … will end and there will be no cash value or life insurance benefit." *Id.*

These notices were on the right timeframe—under both the Statutes and the Policy itself. When the Cash Surrender Value dropped below the Monthly Deduction Charge on June 1—the equivalent of a missed premium for a term-life policy[3]—NYLIAC mailed Mr. Linhart a notice that same day (and thus within 30 days). *See* CAL. INS. CODE §§ 10113.71(b)(3), 10113.72(c). NYLIAC also mailed a notice more than 30 days before the grace period ended. *See id.* §§ 10113.71(b)(1), 10113.72(c); JS-88, JS-107, JS-119.

In response, Plaintiff may argue that NYLIAC should have also mailed notices to a secondary recipient. But NYLIAC did not have to do so. As explained below, NYLIAC complied with any duty to notify Mr. Linhart about a right to name a secondary recipient.

---

[3]   The "due and unpaid" language in §§ 10113.71(b)(3) and 10113.72(c) does not neatly map onto Universal Life policies, which offer flexibility in paying premiums. *Cf. Elhouty v. Lincoln Ben. Life Co.*, 121 F. Supp. 3d 989, 995 n.1 (E.D. Cal. 2015), *aff'd*, 886 F.3d 752 (9th Cir. 2018). In any event, NYLIAC followed the Statutes.

Mr. Linhart never exercised that right, and nothing required NYLIAC to notify someone that Mr. Linhart had not designated. *See Rosen v. Pac. Life Ins.*, 2017 WL 4296655, at *1 (Cal. Ct. App. Sept. 28, 2017) (unpublished); *Scherman v. Farmers New World Life Ins.*, 2017 WL 6947721, at *3 (N.D. Cal. Feb. 21, 2017); *see also McHugh*, 12 Cal. 5th at 238 (stating that no secondary notice is required "if no notice recipient has yet been designated"). In fact, California law broadly *prohibits* insurers from disclosing personal information to other people, *see* CAL. INS. CODE § 791.13, so NYLIAC could not have sent others information about Mr. Linhart's failure to pay premiums without his consent. All told, then, NYLIAC complied with all pre-lapse notice requirements.

### 3. NYLIAC gave Mr. Linhart annual notice of his right to designate a third party to receive notices.

NYLIAC also complied with the annual-notice requirement in § 10113.72(b). The text of § 10113.72(b) is straightforward: "The insurer shall notify the policy owner annually of the right to change the written designation or designate one or more persons. The policy owner may change the designation more often if he or she chooses to do so." Under that plain language, NYLIAC merely needed to "notify" Mr. Linhart that he had a right to designate a secondary recipient for pre-lapse notices. NYLIAC did just that.

Each year between 2013 (when the Statutes took effect) and 2021 (when the Policy lapsed), NYLIAC mailed Mr. Linhart an Annual Policy Summary. JS-20–28. That Annual Policy Summary is the annual "written report" that, under the contract, would provide "facts required by state law." JS-17, 19. Page two of the Annual Policy Summary contained a special section for residents of five states, including "**California Residents**." JS-45. That section had a boldface heading, was set apart by bold lines, used the same type size as the rest of the body text on that page, and explained that Mr. Linhart could "designate a third party to whom we will mail copies of premium, cancellation and lapse notices." JS-45–46. NYLIAC sent this notice to Mr. Linhart every year for nine years. JS-20–28. But Mr. Linhart never designated a secondary recipient. JS-49.

Desperate to invent a violation of the Statutes, Plaintiff complains about the type

(font) size, the placement on page two of the Annual Policy Summary, and the phrasing of the notice. But those arguments all fail for four reasons.

*First*, § 10113.72(b) says nothing about *how* an insurer "shall notify" a policy-owner about the right to add or change a secondary designee—just that the insurer must do so. Section 10113.72(b) says nothing about type size, placement, or phrasing. It does not even require notice by mail. And when interpreting a statute, it is a "'cardinal rule that courts may not add provisions'" to what the Legislature enacted. *People v. Gonzalez*, 12 Cal. 5th 367, 396 (2021) (citation omitted). This Court therefore should not rewrite § 10113.72(b) to add requirements about type size, placement, or phrasing.

*Second*, inventing requirements about type size, placement, or phrasing ignores the context of the Insurance Code as a whole. When the Legislature uses certain language in one part of a statutory scheme but not in another, courts "presume" that omission was intentional. *Walt Disney*, 21 Cal. App. 5th at 879. And in the Insurance Code, the Legislature often dictates type size,[4] whether a notice must be on the first page of a document (or in a separate document),[5] and whether an insurer must use particular language.[6] Yet the Legislature did none of those things here. In this context, the rule that courts do not add to statutory text "takes on added significance." *L.A. Cnty.*, 52 Cal. 4th at 1108. The Court should presume the Legislature did not want the granular requirements that Plaintiff now seeks to impose.

*Third*, there are good reasons for not dictating type size, placement, or phrasing. The method for designating a secondary recipient can vary among insurers or over time. It would be counterproductive to lock insurers into forever using the same language. Document design also requires careful judgment. Only so much text can legibly fit on a page, yet sending too many pages may overwhelm the reader. Not everything can be on

---

[4] *See, e.g.*, CAL. INS. CODE §§ 132(g), 790.034(b)(1), 10083(a)(1), 10113.2(d), 10113.9(b)(2), 10113.70(b), 10120.4(c)(2), 10170(f).
[5] *See, e.g.*, CAL. INS. CODE §§ 132(g), 1764.1(a)(1), 10120.4(c)(2), 10192.17(a), 10232.7(c), 10295.15(a), 10507.3(a).
[6] *See, e.g.*, CAL. INS. CODE §§ 132(g), 790.034(b)(1), 1764.1(b), 10083(a)(1), 10102(a), 10113.2(d)(10), 10113.70(b)–(c), 10120.4(c)(2), 10192.20(a)(3).

the first page of a letter, but sending several letters risks reader frustration. *Cf.* JS-122. Type size and placement can be means of emphasis, but too much emphasis cancels itself out. *Cf. Martin ex rel. Heckman v. Midwest Exp. Holdings, Inc.*, 555 F.3d 806, 810 (9th Cir. 2009) ("'the import of one warning is diluted by additional warnings'" (citation omitted)). The Legislature left it up to insurers to balance these competing interests.

*Fourth*, Plaintiff's attacks on NYLIAC's annual notice simply do not square with the document itself. For starters, consider where NYLIAC placed the notice: in the Annual Policy Summary. That document is promised by the Policy itself and contains crucial information, such as Account Value, Cash Surrender Value, and calculations of when the Policy will lapse. JS-17–19, JS-44. It is just not true that NYLIAC "buried" the notice. To the contrary, including the notice in such an important document made it *more* likely Mr. Linhart would see it. *Cf.* JS-122. It is not on a postcard that could be mistaken for junk or in an overwhelming slew of separate mailings. At the same time, there is nothing wrong with including the notice on page two of the Annual Policy Summary. The entire Annual Policy Summary is only five or six pages long, and much of it is either "white space" or tables of information. There is little text for policyowners to read. NYLIAC must be able to presume that policyowners have a basic willingness to read that important document as a whole.

Consider the formatting, as well. The notice is set apart by bold lines, making it more prominent than most of the page. JS-45. Its boldface heading further stresses its importance and draws the attention of "**California Residents**." *Id.* The body text is in eight-point type—the same as the rest of the page, and much like the rest of the document—and in a standard font. JS-45, JS-46. The Legislature has endorsed eight-point type for other notices,[7] and the three-column layout here makes it even easier to read.

---

[7]   *See, e.g.*, CAL. CIV. CODE §§ 1102.6g(a), 1630(b), 1803.1(b), 2079.10a(a), 2982.5(b); CAL. GOV'T CODE § 84504.3(c); *see also Savetsky v. Pre-Paid Legal Servs., Inc.*, 2015 WL 4593744, at *9 (N.D. Cal. July 30, 2015) ("Two pages in all 8-point type is easily legible and is not so long that anything can be truly obfuscated by its placement.").

Finally, consider the text of the notice. Plaintiff vaguely alleges NYLIAC should have written the notice differently, but there was nothing confusing about the notice, and a court should "not strain to create an ambiguity where none exists." *Waller v. Truck Ins. Exch.*, 11 Cal. 4th 1, 18–19 (1995). NYLIAC used plain English, telling Mr. Linhart that he "can designate a third party to whom we will mail copies of premium, cancellation and lapse notices." The notice did not mention "changing" a prior designation, but the word "designate" naturally covers that option, and nothing mandates copying the statute verbatim. *See, e.g.*, *Galanty v. Paul Revere Life Ins.*, 23 Cal. 4th 368, 376 n.4 (2000) (stating that some deviation from a "statutory form" is "permissible"); *McGreehan v. Cal. State Auto. Ass'n*, 235 Cal. App. 3d 997, 1004 (1991) ("We know of no authority … which states that in order to be found in conformance with a given statute, an insurance policy must adopt the specific language of that legislation."); 16 WILLISTON ON CONTRACTS § 49:85 (4th ed. 2023) (stating, about premium notices, that "unless the statute by its terms requires the use of specific words, the exact words of the statute need not be followed"). Further, because Mr. Linhart never designated a secondary recipient in the first place, JS-49, a reference to "changing" designees could have been confusing, and the lack of a specific reference to "change" is irrelevant.

For these reasons, Plaintiff's attacks on the annual notice fail. Every year after the Statutes took effect, NYLIAC sent Mr. Linhart a reminder that he could designate someone else to receive notices of pending lapse. Section 10113.72(b) required nothing more.

### 4. NYLIAC did not have to send Mr. Linhart a designation "form."

Finally, Plaintiff contends that NYLIAC violated § 10113.72(a) because it did not send Mr. Linhart a "form" that he could use to designate a secondary recipient. Plaintiff is wrong. That provision says a policy "shall not be issued or delivered" in California "until the applicant has been given the right to designate at least one person, in addition to the applicant, to receive notice of lapse or termination of a policy for nonpayment of premium." CAL. INS. CODE § 10113.72(a). "The insurer shall provide each applicant with a form to make the designation," and that "form" must "provide the opportunity for the

applicant to submit the name, address, and telephone number" of a designee. *Id.* But Mr. Linhart applied for the Policy—and NYLIAC issued the Policy—in 2007. JS-1–2. Mr. Linhart was never again an "applicant" for the Policy. *Cf.* JS-128. The Statutes did not take effect until 2013 and cannot govern what happened in 2007. NYLIAC thus cannot have violated § 10113.72(a). The text of the law, the California Supreme Court's opinion in *McHugh*, and basic fairness all agree on this point.

Start with the text. Section 10113.72(a)'s plain language governs only the period before a policy is "issued or delivered," and it refers only to a policy "applicant"—never to an "owner." The Court should give these terms "their usual and ordinary meanings." *Wells v. One2One Learning Found.*, 39 Cal. 4th 1164, 1190 (2006). "The terms 'issued' and 'delivered' [ordinarily] refer to the original issuance and delivery of the policy; they are fixed as to time and do not stretch into infinity." *Ball v. Cal. State Auto. Ass'n Inter-Ins. Bureau*, 201 Cal. App. 2d 85, 87 (1962). And the ordinary meaning of "applicant" is someone who seeks something that he or she has not (yet) obtained. *See, e.g.*, *Applicant*, Black's Law Dictionary (9th ed. 2009) ("One who requests something"); *Applicant*, Webster's Third New International Dictionary (2002) ("one who applies"). Thus, an insurance "applicant" is someone who seeks insurance but does not yet have a contract with the insurer; once the insurer issues a policy, that person stops being an applicant and becomes a policyowner. Plaintiff's own expert gave that interpretation. JS-130. Other parts of the Insurance Code use the term "applicant" in this way,[8] and the Court should presume the Legislature did so here, too. *See Satele v. Superior Ct.*, 7 Cal. 5th 852, 859 (2019); *People v. Gray*, 58 Cal. 4th 901, 906 (2014). But again, Mr. Linhart was an applicant for the Policy in 2007 only; he was not an applicant after NYLIAC issued the Policy or after § 10113.72(a) went into effect. By its plain language, then, § 10113.72(a) did not require NYLIAC to give Mr. Linhart a designation "form."[9]

---

[8]   *See, e.g.*, Cal. Ins. Code §§ 396(b)(1), 791.02(d), 10110.3(a), 10115, 10140(a), 10192.4(a), 10295(b)(3).

[9]   Plaintiff may argue that the Policy "renewed" after 2013, but the "renewal" theory does not apply to life insurance. *See Pitt v. Metro. Tower Life Ins.*, 2023 WL 3879587,

The California Supreme Court reached this conclusion in *McHugh*, explaining that "section 10113.72, subdivision (a), unmistakably applies only to new policies"—that is, to policies issued or delivered after the Statutes took effect in 2013. 12 Cal. 5th at 236. As *McHugh* reasoned, the statutory language "refers repeatedly to the 'applicant' making a written designation, rather than the 'policy owner,' clearly indicating it applies only to new policies." *Id.* Likewise, the phrase "shall not be" signifies a "forward-looking" command, underscoring that § 10113.72(a) "applies only to new policies as of 2013." *Id.* With its use of words like "unmistakably" and "clearly," the California Supreme Court was not just summarizing one of several possible interpretations of § 10113.72(a); it was giving the only interpretation of § 10113.72(a).

Holding otherwise would create an impossible situation for insurers. NYLIAC cannot go back in time and give Mr. Linhart a "form" at the time of his application and before issuing the Policy in 2007. Plaintiff's theory about § 10113.72(a) would impose liability based on what happened years before the Statutes were drafted. The California Supreme Court disclaimed that outcome in *McHugh*, explaining that the Statutes "simply updated how the regulatory system governing life insurance terminations treats all policies *going forward*." 12 Cal. 5th at 235 (emphasis added). The Statutes thus did not implicate "the type of retroactivity that warrants [the] usual level of reluctance to construe statutes retroactively." *Id.* Plaintiff would now have this Court undermine that holding, impermissibly "foist[ing] upon past conduct new and onerous legal consequences." *Pitts v. Perluss*, 58 Cal. 2d 824, 835–36 (1962). There is no reason to go down that road.

Nor is there any reason to rewrite § 10113.72(a) to apply to "owners" as well as "applicants." If the Statutes "appear to create a single, unified … scheme," then it is by regulating "[n]ew" policies under § 10113.72(a) and "existing" policies (plus new ones) under § 10113.72(b). *McHugh*, 12 Cal. 5th at 240. That the Statutes (broadly speaking) apply to all policies means the secondary-notice "component" (broadly speaking) applies

at *4–5 (S.D. Cal. June 5, 2023), *appeal docketed*, No. 23-55566 (9th Cir.). Section 10113.72(a) also uses the terms "issued" and "delivered"—not "renewed"—and a policy is issued and delivered only once. *See Ball*, 201 Cal. App. 2d at 87.

to all policies, but it does not mean that § 10113.72(a) requires sending a "form" to pre-2013 policyowners. *Id.* Section 10113.72(b)—and NYLIAC's standard practices—still give annual notice of a right to designate a secondary recipient. That is, applicants who become policyowners still receive notice of the right to designate; the "meaningfully distinct language" in § 10113.72(b) just does not require sending those people a "form." *McHugh*, 12 Cal. 5th at 237 & n.7.

Again, NYLIAC will send a designation form to a policyowner who asks for one. *See* JS-47–48. But the Legislature chose not to inundate existing policyowners with more paper. Courts cannot second-guess that choice or, "'under the guise of construction, re-write the law.'" *Cal. State Univ., Fresno Ass'n v. Cnty. of Fresno*, 9 Cal. App. 5th 250, 268 (2017) (citation omitted). Nor should the Court assume that following the statutory text—which is "the most reliable indication[] of the Legislature's intent"—can somehow frustrate legislative intent. *Cummins, Inc. v. Superior Ct.*, 36 Cal. 4th 478, 487 (2005). The Court should instead recognize that § 10113.72(a) does not apply here and therefore cannot sustain Plaintiff's breach-of-contract claim.

Because NYLIAC fully complied with the Statutes, Plaintiff's breach-of-contract claim fails. The Policy lapsed according to its terms, and NYLIAC cannot have breached the Policy when it declined to pay benefits.

**B.  A violation of the Statutes would not be a breach of contract here.**

Apart from whether NYLIAC followed the Statutes, Plaintiff's other arguments also fail. Plaintiff alleged that a violation of § 10113.72(a) or (b) is a breach of contract. ECF No. 38, ¶ 62(a)–(b). That is wrong for two reasons.

*First*, "[a]n insurer's failure to comply with [an insurance] regulation does not, in itself, establish a breach of contract." *Safeco Ins. Co. of Am. v. Parks*, 170 Cal. App. 4th 992, 1006 (2009). After all, as a default rule, "neither the Insurance Code nor regulations adopted under its authority provide a private right of action." *Rattan*, 84 Cal. App. 4th at 724.[10] The Legislature generally intends for the California Department of Insurance—

---

[10]   Other courts also recognize that a breach-of-contract claim requires more than a

not private plaintiffs—to enforce the Insurance Code. *See, e.g.*, *Moradi-Shalal v. Fireman's Fund Ins.*, 46 Cal. 3d 287, 304–05 (1988). Holding that a statutory violation is automatically a breach of contract—or that a violation perpetually prevents a policy from terminating—would be an improper end-run around the rule that the Legislature must speak clearly to create a private right of action. *See Vikco Ins. Servs. v. Ohio Indem.*, 70 Cal. App. 4th 55, 62–63 (1999).

*Second*, it is a basic rule that "'insurance policies are governed by the statutory and decisional law in force at the time the policy is issued.'" *Stephan v. Unum Life Ins. Co. of Am.*, 697 F.3d 917, 927 (9th Cir. 2012) (citation omitted). Those *preexisting* laws are "read into each policy thereunder, and become a part of the contract,'" *id.* (citation omitted), but *new* statutes do not automatically rewrite old contracts, *see Interins. Exch. of Auto. Club of S. Cal. v. Ohio Cas. Ins.*, 58 Cal. 2d 142, 148–49 (1962). True, *McHugh* said that when policies are "required by the [Insurance Code] to include certain provisions," then those mandatory provisions "are deemed to be incorporated into every policy to which they pertain." 12 Cal. 5th at 224. Yet the Statutes were not in force when the Policy was issued. And even in *McHugh*, the California Supreme Court distinguished between (1) rewriting policy terms and (2) making "relatively cabined, procedural changes to how insurers administer policies." *Id.* at 231. Though the Statutes now govern how insurers act "when, in the future," a policyowner fails to pay premiums, the Statutes "do not unfairly 'rewrite' existing policies" across the board. *Id.*

Applying these principles shows that a violation of § 10113.72(a) or (b) is not itself a breach of contract. Nothing in § 10113.72(a) or (b) suggests that those provisions are read into pre-2013 policies in a way that supports a contract claim. Neither requires including anything in an insurance policy; they merely impose procedural requirements

---

statutory violation. *See, e.g.*, *Park v. AXA Equitable Life Ins.*, 2023 WL 1931373, at *4 n.8 (C.D. Cal. Jan. 11, 2023) (holding that whether an insurer violated insurance statutes "does not affect the outcome of Plaintiff's breach of contract claim"), *appeal docketed*, No. 23-55130 (9th Cir.). The mere fact that the Policy is subject to applicable California laws changes nothing. *See, e.g.*, *Brosnan v. Castellanos*, 2009 WL 2246210, at *3 (N.D. Cal. July 27, 2009).

outside the contract. (By contrast, § 10113.71(a) does dictate that a policy "shall contain a provision" for a 60-day grace period.) Violating those external procedural requirements cannot be a breach of contract. Otherwise, an insurer that failed to send a policy applicant a "form" under § 10113.72(a) could be said to have "breached" a contract based on what it failed to do *before* a contract ever existed. That is illogical.

This is not to say that § 10113.72(a) and (b) are toothless, just that they must be enforced like most insurance laws: by the CDI. It is common that the "sole remedy for alleged violations" of statutory provisions is an "administrative" remedy—not a private lawsuit. *Vikco Ins. Servs.*, 70 Cal. App. 4th at 68. By contrast, Plaintiff's theory contra-dicts California law by effectively creating a private right of action for any statutory violation. Thus, even if Plaintiff could show that NYLIAC violated § 10113.72(a) or (b), that could not satisfy the "breach" element of her contract claim.

### C.  Plaintiff cannot show that any statutory violation proximately caused harm.

Even if Plaintiff could show a "breach," she still cannot prove the fourth element of her common-law contract claim: "resulting damage." *Oasis W. Realty*, 51 Cal. 4th at 821. Mr. Linhart voluntarily let the Policy lapse. Plaintiff cannot show that anything about designation forms or annual notices would have changed that.

"Implicit in the element of damage is that the defendant's breach *caused* the plain-tiff's damage," *Troyk v. Farmers Grp.*, 171 Cal. App. 4th 1305, 1352 (2009), and it is "essential" to prove "damages *resulting from the breach*," *St. Paul Fire & Marine Ins. v. Am. Dynasty Surplus Lines Ins.*, 101 Cal. App. 4th 1038, 1061 (2002); *see Crossroads Invs. v. Fed. Nat'l Mortg. Ass'n*, 13 Cal. App. 5th 757, 792 (2017) ("'[D]amages cannot be *presumed* to flow from liability.'" (citation omitted)). Courts do not consider "breach" in the abstract, either; they instead examine the results of the "specific breach." *Postal Instant Press, Inc. v. Sealy*, 43 Cal. App. 4th 1704, 1709 (1996). A plaintiff must prove her damages were "'proximately caused' by the specific breach." *Id.*

Here, the specific breach would be a violation of the Statutes. *See Steen v. Am. Nat'l Ins.*, 2023 WL 4004192, at *7–8 (C.D. Cal. June 14, 2023). California law thus

requires Plaintiff to prove that a specific violation of the Statutes was the proximate cause of her alleged harm. *Id.* But if the Policy would have lapsed anyway, then any violation of the Statutes caused no harm. *Id.* Other courts agree. *See, e.g.*, *Nieves v. United of Omaha Life Ins.*, 2023 WL 2705836, at *9 (S.D. Cal. Mar. 28, 2023); *Pitt v. Metro. Tower Life Ins.*, 2022 WL 17972167, at *7 (S.D. Cal. Dec. 1, 2022).[11] In *McHugh* itself, the California Court of Appeal held that "plaintiffs had the burden of proving they were harmed by [a] breach," *McHugh v. Protective Life Ins.*, 2022 WL 6299640, at *9 (Cal. Ct. App. Oct. 10, 2022) (unpublished), and the California Supreme Court recognized that whether a plaintiff can recover after proving a statutory violation is a jury question, *see McHugh*, 12 Cal. 5th at 246 n.10 (explaining that whether plaintiffs "are entitled to recover" would require the Court "to address the correctness of the jury's verdict").[12] This reflects the California Supreme Court's understanding that "inadvertent defaults"—not intentional lapses—"is the problem the [Statutes] were designed to address." *Id.* at 233.[13]

Plaintiff cannot show that anything about the annual secondary designee notice affected Mr. Linhart's decision to stop paying premiums. Nor can Plaintiff show that a failure to receive a designation "form" affected the Policy's lapse. For over a year before the Policy terminated, NYLIAC warned Mr. Linhart that his Policy was in danger of lapsing. JS-57–70, JS-88–98, JS-107–118. Mr. Linhart knew he owed premiums, and in June 2021, he told NYLIAC that he wanted to "cancel" the Policy. JS-100. This mirrors

---

[11]  *See also Lara v. First Nat'l Ins. Co. of Am.*, 25 F.4th 1134, 1139–40 & n.4 (9th Cir. 2022) (applying similar requirements under Washington law).

[12]  Plaintiff will cite *Thomas v. State Farm Life Insurance*, 2021 WL 4596286 (9th Cir. Oct. 6, 2021), but that non-precedential disposition has no considered analysis, misreads the Statutes, and departs from basic elements of a contract claim. Causation also was not squarely before the Ninth Circuit. *See* Appellee's Answer Br. at 11, *Thomas v. State Farm Life Ins.* (9th Cir. Aug. 27, 2020) (No. 20-55231), 2020 WL 5351406 ("The issue of causation … was not before the district court and likewise should not be before this court."); *Thomas v. State Farm Ins.*, 424 F. Supp. 3d 1018, 1022 (S.D. Cal. 2019) (observing that "the only issue" was whether the Statutes applied).

[13]  *See also, e.g.*, *Bentley v. United of Omaha Life Ins.*, 2018 WL 3357458, at *6 (C.D. Cal. May 1, 2018) (individually reviewing all 45 policies in a putative class, excluding 11 that lapsed "because of the policyholder's own affirmative choice"); *Steen*, 2023 WL 4004192, at *9.

his April 2021 statements that he wanted to "cancel" his John Hancock policy and was "just going to stop paying." JS-75. Under these facts, Plaintiff cannot show that any statutory violation was "the proximate cause of the nonpayment of death benefits." *Steen*, 2023 WL 4004192, at *8. Mr. Linhart "no longer wanted coverage" from NYLIAC and intentionally stopped paying premiums, *id.*, so he suffered "no damages" when his coverage ended, *Nieves*, 2023 WL 2705836, at *9. Nothing in the Statutes lets plaintiffs automatically recover for a violation of § 10113.72(a) or (b) that caused no harm.

Plaintiff argues that a failure to provide so-called "Designation Notices" under the Statutes triggers an "anti-termination" legal fiction that a policy stays in force without any payment of premiums. But other courts have rejected that strict-liability theory. *See, e.g.*, *Steen*, 2023 WL 4004192, at *2, *9. This Court should do the same. When it mandated a 60-day grace period, the Legislature knew how to say that a policy "shall remain in force," but it did not impose that strict-liability result for all violations. Cal. Ins. Code § 10113.71(a). Section 10113.71(b)(1) speaks to whether a pre-lapse *notice* is "effective"—and thus whether the notice supports an affirmative defense of cancellation—but it does not say that a *policy* stays in force. Section 10113.72(c) also contains a prohibition that the CDI can enforce, but it does not make prohibited conduct impossible or otherwise create a legal fiction. And *no* statutory provision says that a failure to give a "form" under § 10113.72(a) or an annual notice under § 10113.72(b) leaves a policy in force forever; neither subdivision "contain[s] any language about rendering lapse or termination ineffective." *Steen*, 2023 WL 4004192, at *2. Any attempt to argue otherwise mishmashes and distorts the language of the Statutes. This Court should reject that attempted slight-of-hand.

### D.  Plaintiff cannot establish an excuse for nonperformance.

Finally, Plaintiff cannot establish the second element of her contract claim: "performance or excuse for nonperformance." *Oasis W. Realty*, 51 Cal. 4th at 821. Mr. Linhart had to pay premiums to maintain coverage. Plaintiff, however, cannot show that Mr. Linhart paid sufficient premiums: As of June 1, 2021, the Cash Surrender Value was not

enough to pay the Monthly Deduction Charge. JS-87. Yet Mr. Linhart paid *nothing* after May 3, 2021. JS-85. Because Mr. Linhart did not fulfill his obligation, it is Plaintiff's burden to show that Mr. Linhart was legally excused from paying premiums before the Policy lapsed. *See Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1367–68 (2010). But Plaintiff cannot meet that burden, either. In fact, she alleged *no* excuse for Mr. Linhart's nonpayment. *See generally* ECF No. 38. As a result, NYLIAC is entitled to summary judgment. *See Abdelhamid v. Fire Ins. Exch.*, 182 Cal. App. 4th 990, 999 (2010).

***

For each of these independent reasons, Plaintiff's breach-of-contract claim fails.

## II. NYLIAC is entitled to summary judgment on Plaintiff's bad-faith claim.

Plaintiff also asserts a cause of action against NYLIAC for purported "bad faith." ECF No. 38 at 22:16–25:2. To prevail on that claim, Plaintiff would have to prove that (1) "benefits due under the policy were withheld" and (2) "the reason for withholding benefits was unreasonable or without proper cause." *Guebara v. Allstate Ins.*, 237 F.3d 987, 992 (9th Cir. 2001). Because Plaintiff does not have a valid contract claim, her bad-faith claim "fails as a matter of law." *Behnke v. State Farm Gen. Ins.*, 196 Cal. App. 4th 1443, 1470 (2011). But even if policy benefits were due, Plaintiff still could not satisfy her burden of showing that NYLIAC acted unreasonably or without proper cause.

California courts have long held that bad-faith claims require "'something beyond breach of the contractual duty.'" *Chateau Chamberay Homeowners Ass'n v. Assoc. Int'l Ins.*, 90 Cal. App. 4th 335, 345 (2001) (citation omitted). Mistakes, "'if reasonable or if based on a legitimate dispute as to the insurer's liability,'" do not suffice. *Id.* at 346 (citation omitted). And "where there is a genuine issue as to the insurer's liability," then "there can be no bad faith liability imposed on the insurer for advancing its side of that dispute." *Id.* at 347 (emphasis omitted). Importantly, "bad faith is to be determined solely by objective unreasonability." *Bosetti v. U.S. Life Ins. Co. in City of N.Y.*, 175 Cal. App. 4th 1208, 1238–39 (2009). "'If the conduct of the insurer in denying coverage was objectively reasonable, its subjective intent is irrelevant.'" *Id.* at 1236 (citation omitted).

1 But even as bad faith is an objective test, "it has been held that 'bad faith implies unfair
2 dealing rather than mistaken judgment.'" *Nieto v. Blue Shield of Cal. Life & Health Ins.*,
3 181 Cal. App. 4th 60, 86 (2010) (citation and internal brackets omitted).

4     Given this standard, Plaintiff cannot carry her burden to show that NYLIAC acted
5 in bad faith. To the contrary, the record shows that NYLIAC was reasonable. NYLIAC
6 did everything that the plain text of the Statutes required. In fact, it did *more* than what
7 the law required. When NYLIAC issued the Policy, the Insurance Code did not require
8 any grace period or pre-lapse notice. *McHugh*, 12 Cal. 5th at 224. Yet NYLIAC wrote
9 the Policy to include a 62-day grace period and promise a pre-lapse notice. JS-16. NYL-
10 IAC then complied with the Policy and the Statutes, giving more grace than the Statutes
11 required and sending multiple pre-lapse notices (not just one). JS-88, 107. And each year
12 from 2013 onward, NYLIAC notified Mr. Linhart that he could designate another person
13 to receive notices. JS-20–28, 45. Those reminders were prominent, convenient, and in
14 plain English. It is reasonable to conclude the Statutes required nothing more.

15     Likewise, it is reasonable to conclude that § 10113.72(a) does not apply to policies
16 issued before 2013. Section 10113.72(a)'s plain text requires providing a designation
17 "form" only to "applicants"—not policyowners—and Mr. Linhart was not an "applicant"
18 after 2007. Again, the California Supreme Court agrees. *McHugh*, 12 Cal. 5th at 236–37
19 & n.7. It cannot be bad faith to agree with that court on a question of state law. *See, e.g.*,
20 *Opsal v. USAA*, 2 Cal. App. 4th 1197, 1205–06 (1991).

21     And it is reasonable to conclude that the Statutes do not require paying benefits
22 when, as here, a policyowner knowingly lets the policy lapse. *See, e.g.*, *Steen*, 2023 WL
23 4004192, at *9. NYLIAC thus is entitled to summary judgment on the bad-faith claim.

24 **III. NYLIAC is entitled to summary judgment on punitive damages.**

25     Finally, Plaintiff seeks punitive damages, ECF No. 38 at 25:14–25, but she cannot
26 recover them for at least two reasons. One is that she cannot recover compensatory dam-
27 ages. *See California v. Altus Fin. S.A.*, 540 F.3d 992, 1001 (9th Cir. 2008). The other is
28 that she cannot satisfy the stringent test for punitive damages.

Punitive damages "'are not favored in the law,'" *Doe v. Lee*, 79 Cal. App. 5th 612, 618 (2022) (citation omitted), and any award of punitive damages requires "clear and convincing evidence … of oppression, fraud, or malice," CAL. CIV. CODE § 3294(a). Those terms have specific definitions. *Id.* § 3294(c); *Butte Fire Cases*, 24 Cal. App. 5th 1150, 1158–59 (2018). Under those definitions, even bad faith is not itself enough. The evidence needed for punitive damages "is 'of a different dimension' from that needed to support a finding of bad faith." *Shade Foods, Inc. v. Innovative Prod. Sales & Mktg., Inc.*, 78 Cal. App. 4th 847, 909 (2000) (quoting *Tomaselli v. Transam. Ins.*, 25 Cal. App. 4th 1269, 1286 (1994)). Further, "'some evidence should be required that is inconsistent with the hypothesis that the tortious conduct was the result of a … noniniquitous human failing.'" *Butte Fire Cases*, 24 Cal. App. 5th at 1170 (citation omitted).

Here, there is no evidence—much less the required "clear and convincing evidence"—of oppression, fraud, or malice. *See In re First All. Mortg. Co.*, 471 F.3d 977, 998–99 (9th Cir. 2006) (explaining that the "clear and convincing evidence" standard applies on summary judgment). Even if Plaintiff could show that NYLIAC were wrong, she cannot show that its actions "'could be described as evil, criminal, recklessly indifferent to the rights of the insured, or with a vexatious intention to injure.'" *Food Pro Int'l, Inc. v. Farmers Ins. Exch.*, 169 Cal. App. 4th 976, 995 (2008) (citation omitted). NYLIAC is therefore entitled to summary judgment on punitive damages.

## CONCLUSION

For these reasons, NYLIAC's Motion for Summary Judgment should be GRANTED.

1   Date: March 8, 2024                              MAYNARD NEXSEN PC

2                                                    /s/ *John A. Little, Jr.*
3                                                    Michael D. Mulvaney (*pro hac vice*)
                                                     John A. Little, Jr. (*pro hac vice*)
4                                                    Caleb C. Wolanek (*pro hac vice*)

5                                                    MAYNARD NEXSEN LLP
6                                                    Cindy M. Rucker (SBN 272465)

7                                                    *Attorneys for Defendant*
8                                                    *New York Life Insurance and Annuity Corp.*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NYLIAC's Brief in Support of its Motion for Summary Judgment